IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | |
| JOHN W. MACNAMARA and | * | CHAPTER 7 |
| MARILYN A. MACNAMARA, | * | |
| Debtors | * | |
| | * | CASE NO. 1:08-bk-03895MDF |
| ROBERTA A. DeANGELIS, | * | |
| ACTING UNITED STATES TRUSTEE, | * | |
| Movant | * | |
| | * | |
| v. | * | |
| | * | |
| JOHN W. MACNAMARA and | * | |
| MARILYN A. MACNAMARA, | * | |
| Respondents | * | |

## OPINION

Before me is the motion of the United States Trustee ("UST") to dismiss the chapter 7 bankruptcy case of John and Marilyn MacNamara ("Debtors"). Invoking 11 U.S.C. § 707(b)(1) and (3) as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8 ("BAPCPA"), the UST alleges that, given the totality of the circumstances, this case is an abuse of chapter 7 and should be dismissed. For the reasons set forth below, the UST's motion will be granted.

### I. Procedural History

Debtors filed their bankruptcy petition on October 22, 2008. The UST moved to dismiss the case on January 23, 2009. A hearing was held on April 20, 2009, the matter was taken under advisement and is now ready for decision.[1]

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law required to be made by Federal Rule of Bankruptcy Procedure ("FRBP") 7052, which is applicable to contested matters pursuant to FRBP 9014.

## II. Factual Findings

Debtors reside on a twenty-five acre property in Mifflin County, Pennsylvania in a renovated farm house consisting of approximately 2200 square feet of living space that they purchased in November 2005 for approximately $250,000.00. The acreage is not used for farming or other income-producing purposes. Debtors moved to Mifflin County from Lititz, Pennsylvania in November 2005 because, as John MacNamara ("Mr. MacNamara") stated, they wanted to "experience a different lifestyle." (N.T. 8). Debtors received proceeds of approximately $140,000.00 from the sale of the Lititz residence. To acquire the Mifflin County property pending closing on the Lititz residence, Debtors took out a $180,000.00 mortgage and obtained a bridge loan to finance the balance of the purchase price and other settlement charges. Mr. MacNamara testified that $50,000.00 to $60,000.00 from the proceeds of the sale was used to pay off the $15,000.00 second mortgage on the Lititz property and to pay down unsecured debt. (N.T. 40)

Debtors' housing expenses increased significantly after they moved to Mifflin County. When the property was purchased in 2005, the structure was in disrepair and required extensive renovations. In November 2006, Debtors obtained a loan secured by a second mortgage in the amount of $96,000.00 to build a 250-square-foot addition to the kitchen and dining room as well as to repair termite damage to the structure. After additional problems with the house were identified, Debtors obtained a third loan in August 2007secured by a mortgage in the amount of $40,400.00. Mr. MacNamara testified that the proceeds of the third loan were used to repair a large deck on the front of the house. (N.T. 14) In addition to expanding the kitchen and dining space, Debtors made extensive renovations throughout the home. At the time Debtors obtained

2

the July 2007 mortgage, the property was appraised at $320,000.00. Although the exact amount was not specified, Mr. MacNamara testified that some unsecured debt also was incurred to improve and maintain the property. (N.T. 44)

Mr. MacNamara testified that Debtors have not attempted to sell the residence because they are not certain that they could obtain a price sufficient to satisfy the outstanding mortgages, particularly if they had to pay a broker's commission. (N.T. 18-19) When they filed their petition Debtors were making three monthly mortgage payments on the Mifflin County property totaling $2,608.00, as compared with their prior mortgage payment on the Lititz property of $1,350.00 a month.[2]

Debtors report on their schedules that they own five motor vehicles: (1) a 1998 Saturn valued at $200.00;[3] (2) a 2004 Chevy Blazer valued at $7,450.00; (3) a 2004 Chevy Silverado valued at $4,870.00; (4) a 2006 Chevy Uplander valued at $12,645.00; and (5) a Can Am ATV valued at $5,500.00. The Saturn was in their daughter's possession on the date of the hearing, while the Blazer was in the possession of their son. Debtors' original statement of intention indicated that they intended to retain all of these vehicles. At the hearing, however, Mr. MacNamara testified that Debtors had reconsidered this position and intended to surrender the Uplander and Blazer. As of the date of this Opinion, no amended statement of intention has been filed confirming Debtors' intention to surrender the vehicles, and the record does not otherwise

---

[2]In his testimony, Mr. MacNamara reported that the monthly mortgage payment was approximately $1,350.00 per month. It is unclear from the record whether monthly payments were being made on the loan secured by the second mortgage. Therefore, the difference between the housing expenses before and after Debtors relocated cannot be determined precisely.

[3]The Saturn is not subject to any liens or encumbrances.

3

indicate whether the vehicles have been surrendered. However, assuming Debtors fulfill this intention, they will be retaining only the Saturn, the Silverado[4] and the ATV.[5]

Prior to their bankruptcy filing, Debtor routinely paid for the insurance covering the vehicles operated by their children. At the hearing, Mr. MacNamara stated that Debtors no longer would be making these payments. Therefore, he anticipated that his monthly motor vehicle insurance payments would be reduced to approximately $100.00 per month.

On Schedule F Debtors list unsecured, non-priority debts totaling $160,074.33. Of this amount, $27,324.22 is attributable to a student loan obligation that Mrs. MacNamara incurred in 2001. The remainder of the debt was incurred after Debtors moved to Mifflin County. Debtors do not dispute that the debts in their case are primarily consumer debts.

Debtors' income was derived from several sources from late 2007 until the date of the hearing . Their original Schedule I reports total household monthly income of $9,357.33. Mr. MacNamara is self-employed as a food broker through Distributions Sources, Inc. ("DSI"), a Pennsylvania subchapter "S" corporation that he owns and operates from his home. DSI owns no assets and, according to Mr. MacNamara, was established essentially for tax purposes.(N.T. 6) He earns a salary of $583.34 a month from DSI and receives an additional $4,015.32 per month in income as a distribution from the corporation. Mr. MacNamara also receives $1,790.00 a month in pension income. For some period before the filing, not precisely specified in the

---

[4]After they filed their petition Debtors paid off the balance due on the Silverado – approximately $4,200.00.

[5]Debtors asserted that the payments for the ATV are a reasonable and necessary expense because the vehicle is used to plow snow from their long driveway and to gather firewood to heat their home.

testimony, Mr. MacNamara received two monthly payment of $1,500.00 and $1,600.00 as a beneficiary to annuities held by his mother and aunt. In late 2007 or early 2008, Mr. MacNamara no longer was receiving these payments.

When the petition was filed, Marilyn MacNamara ("Mrs. MacNamara") was receiving unemployment compensation of $2,335.67 per month along with a pension from the Commonwealth of Pennsylvania in the amount of $633.00 per month. She previously had been employed by Reflex Oncology, a Florida corporation, where she performed quality assurance reviews of cancer abstracting records. At the time of the hearing, Mrs. MacNamara was retired and did not anticipate reentering the work force. During most of 2008 she was unemployed. In April 2008, she underwent knee replacement surgery and then suffered a hip fracture after a fall in September 2008. At the time of the hearing, Mrs. MacNamara was receiving Social Security benefits, but she no longer was eligible for unemployment compensation.

Due to post-petition changes in their incomes and expenses, Debtors filed amended Schedules I and J on April 17, 2009. Amended Schedule I reported total household monthly income of $7,526.45, a reduction of approximately $1,800.00 from the income reported on their original Schedule I.[6] This reduction was attributed to post-petition increases in the payroll deductions from Mr. MacNamara's salary and reduced income from DSI. The most significant change to Debtors' household income, however, was the termination of Mrs. MacNamara's unemployment compensation payments of $2, 335.67. This latter reduction was partially offset

---

[6]When the monthly amounts reported on Schedule I are computed on an annual basis, Debtors project approximately $90,312.00 in income. In 2008, Debtors reported on their tax returns annual income of approximately $103,833.00 and in 2007 reported annual income of approximately $138, 181.00.

5

by her receipt of monthly Social Security payments of $845.00.

Debtors also report on their amended Schedule J a reduction in expenses from the original filing. The original Schedule J reported household expenses totaling $9,855.00 per month, while the amended schedule reports expenses of $8,041.00 per month. The UST has questioned the reasonableness of the following monthly expenses included on Debtors' amended schedules:

| | |
|---|---|
| First mortgage | $1,327.00 |
| Second mortgage | $ 891.00 |
| Third mortgage | $ 390.00 |
| Life insurance premiums | $ 566.00 |
| Auto insurance premiums | $ 198.00 |
| All terrain vehicle payment | $ 170.00 |
| Student loan payment | $ 260.00 |
| Cell phone bill | $ 286.00 |
| Past-due taxes | $ 858.00[7] |

The UST argues that if these expenses were reduced or eliminated, Debtors would have sufficient disposable income to devote to a chapter 13 plan.

### III. Discussion

Section 707(b) of title 11 requires a bankruptcy court to dismiss a chapter 7 case filed by an individual debtor whose debts are primarily consumer debts if granting relief would constitute an abuse of the provisions of chapter 7. When the presumption of abuse does not arise under § 707(b)(2), a case may be dismissed if the court determines that the petition was filed in bad faith or that "the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C.A. § 707(b)(3). To identify abuse, a court must consider a debtor's future

---

[7]The UST does not object to the payment of past due taxes, but observes that at the projected monthly payment amount of $858.00, Debtors' tax obligations of $10,354.00 will be paid in full in approximately one year. The UST argues that once the past due taxes are paid, Debtor will have disposable income to apply to payments in a chapter 13 plan.

6

income and expenses as well as his financial circumstances when the petition was filed. *In re Lipford*, 397 B.R. 320, 328 (Bankr. M.D.N.C. 2008).

The UST bears the burden of proving by a preponderance of the evidence that the filing of the petition constitutes abuse in the totality of the circumstances. *In re Colgate*, 370 B.R 50 (Bankr. E.D. N.Y. 2007); *In re Miller*, 335 B.R. 335 (Bankr. E.D. Pa. 2005). In the within case, the UST's argument for dismissal centers primarily on Debtors' proposed family budget, which the UST finds to be excessive and unreasonable. If Debtors' budget were trimmed, the UST argues, Debtors would have sufficient disposable income to repay a significant portion of their unsecured debt.

A debtor's ability to repay debt is an important factor in the analysis of the totality of the circumstances, but it must be considered in the context of other relevant factors. *In re Pfiefer*, 365 B.R. 187, 193 (Bankr. D. Mont. 2007) (debtor's ability to pay is important factor under § 707(b)(3)); *In re Paret*, 347 B.R. 12 (Bankr. D. Del. 2006) (totality of circumstances test includes consideration of ability to pay); *In re Pak*, 343 B.R. 239, 244 (Bankr. N.D. Cal. 2006) (debtor's ability to repay debts may be considered as part of the totality of circumstances of his financial situation). This Court has found the following factors to be useful when considering whether the filing of a petition is abuse under the totality of circumstances in a given case: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment; (2) whether the debtor made consumer purchases far in excess of his ability to repay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statements of current income and expenditures reasonably and accurately reflect his true financial condition; (5) whether the bankruptcy petition was filed in

7

Case 1:08-bk-03895-MDF    Doc 31    Filed 06/05/09    Entered 06/05/09 13:50:35    Desc
Main Document    Page 7 of 17

bad faith;[8] (6) whether the debtor engaged in eve of bankruptcy purchases; (7) whether the debtor enjoys a stable source of future income; (8) whether he is eligible for adjustment of his debts through chapter 13 of the Bankruptcy Code; (9) whether there are state remedies with the potential to ease his financial predicament; (10) the degree of relief obtainable through private negotiations; and (11) whether the debtor's expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities. *In re Hoffman*, 2008 WL 5158292 at *3 (Bankr. M.D. Pa. 2008) (citing *In re Krohn,* 886 F.2d 123, 126 (6th Cir. 1988); *In re Green*, 934 F.2d 568 (4th Cir. 1991)). I will examine these factors to the extent that they apply to the facts in the within case.

> **A.** ***Krohn/Green* factors**
>
> **1.    Sudden disability, calamity or unemployment**

Debtors' financial distress was not created by a sudden calamity, precipitating unexpected expenses or a reduction in income. Rather, Debtors took on substantial debt in the process of renovating their Mifflin County home, which evolved over the next two years into the proverbial "money pit," severely limiting their ability to respond to subsequent financial setbacks. In 2006 and 2007, Debtors obtained second and third mortgages on the property to make improvements. In addition, they accumulated significant unsecured debt to meet their own living expenses, to make improvements to their home and to provide financial assistance to their adult children. At the same time they were acquiring additional debt, their income was dropping, primarily as a

---

[8]One of the factors considered in the totality of the circumstances analysis is whether the petition was filed in bad faith. Because a case may be dismissed on bad faith alone under § 707(b)(3)(A), the totality of the circumstances analysis is applied most often in cases in which evidence of bad faith either is not present or is a minor factor.

result of Mrs. MacNamara's medical problems and the cessation of the annuity payments.

### 2. Whether Debtors made consumer purchases far in excess of their ability to repay

Debtors clearly made consumer purchases in excess of their ability to pay. However, the clarity of this observation is apparent only in hindsight. Between 2005 and 2008 Debtors incurred significant secured and unsecured debt to make improvements to their home. During the same period, Mrs. MacNamara underwent several surgeries, followed by rehabilitation and then retirement. Debtors were not overleveraged when they acquired the Mifflin County property, but the debt that they subsequently incurred to improve it, coupled with Mrs. MacNamara's medical problems, created an untenable financial situation.

Mr. MacNamara testified that at their 2005 settlement, Debtors paid down their unsecured debt to approximately $10,000.00 (N.T. 40).[9] When Debtors filed their petition three years later, they owed more than $160,000.00 to unsecured creditors. Debtors admitted that they incurred significant unsecured debt in the three years before they filed to make improvements to their home. But during this period they were both gainfully employed and received additional income from other sources. The Court is unable to determine with any certainty whether it should have been clear to Debtors that they would be unable to repay the debts when they were incurred.

---

[9]The accuracy of this statement is suspect. Clearly, it ignores the existence of the student loan debt listed at $27,324.33 on Schedule F that was outstanding in 2005.

9

### 3. Whether Debtors' proposed family budget is excessive or unreasonable

Under the totality of the circumstances analysis, the Court must determine whether the amount spent by Debtors for housing is reasonable and necessary. In considering whether housing expenses are excessive, due regard should be given to the size of the family, their needs, and the cost of alternative housing. Further, when relevant, consideration should be given to a debtor's long-standing ties to a homestead. *See In re Miller,* 335 B.R. 335, 342 (Bankr. E.D. Pa. 2005); *In re Beitzel,* 333 B.R. 84, 90 (Bankr. M.D.N.C. 2005). Debtors' three mortgage payments total $2,608.00 a month and constitute 35% of their monthly income ($7,526.45).

Under the Internal Revenue Service Collection Financial Standards ("IRS Standards"), which have been grafted onto the Bankruptcy Code through the means test calculation set forth in § 707(b)(2), a two-person household in Mifflin County is entitled to spend $586.00 per month on housing. Several bankruptcy courts, including this one, have found the IRS standards to be useful in establishing baseline figures for a family budget in the § 707(b)(3) context. *See In re Hoffman,* 2008 WL 5158292 at *3 (Bankr. M.D. Pa.) (citing cases). Considering that Debtors are paying more than 30% of their income on housing and that their monthly mortgage payments are more than four times greater than the IRS allowance, I find Debtors' housing expense to be excessive.[10] Debtors should be able to find suitable rental housing at a rate that is comparable to the $1,350.00 per month mortgage payment that they were paying in 2005. Further, if they surrendered the home in which they concede that they have no equity, they no longer would need

---

[10] The Court appreciates the irony that while I may find Debtors' housing expenses to be excessive under the § 707(b)(3) totality of the circumstances test, under the means test of § 707(b)(2), Debtors are permitted to deduct from their income the three mortgage payments because of the unlimited deduction for secured debt.

to retain the ATV at a monthly expense of $170.00.

Another expense challenged by the UST is Debtors' monthly premiums for life insurance. Mr. MacNamara testified that Debtors are paying premiums of approximately $543.96 each month for five life insurance policies.[11] Mr. MacNamara is the insured on three term life insurance policies, and Mrs. MacNamara is the insured on one term and one whole life policy. Mr. MacNamara's life is insured in the amount of $600,000.00, and Mrs. MacNamara's life is insured in the amount of $119,159.00.

The monthly premium on the whole life policy insuring Mrs. MacNamara's life is an unreasonable expense. Whole life policies generally are investment vehicles, and the payment of premiums to maintain the policy is not a justifiable expense for a chapter 7 debtor.[12] On two of the term policies, Debtors' children, in addition to Mrs. MacNamara, are beneficiaries on the policies. To the extent that any of the policies benefit Debtors' adult children, they are unreasonable and unnecessary. Both Debtors have several sources of income in the event of the death of the other spouse. However, because of Mrs. MacNamara's medical issues and dependence upon Mr. MacNamara for support, some level of life insurance on Mr. MacNamara's life is reasonable. He currently has policies in place insuring his life in the total amount of

---

[11] The testimony regarding Debtors' life insurance was less than crystalline. On direct, Debtors offered five policies into evidence, but did not include a policy with USAA owned by Mrs. MacNamara insuring the life of Debtors' son Jonathan that was included on their amended Schedule F.

[12] The means test form applicable in chapter 7 cases (Official Form 22A) includes life insurance on line 27 as a necessary expense but specifically provides that the allowable premiums are for term life insurance on the debtor and not insurance on dependents or for whole life policies.

11

$350,000.00 with premiums totaling $188.65 a month.[13] I find this to be a reasonable expense under the circumstances of this case.

Debtors' auto insurance premiums as listed on Schedule J also are excessive. Debtors have admitted that their premiums will decrease from $198.00 per month to approximately $100.00 per month after Debtors surrender two vehicles and cease paying for their children's automobile insurance. Likewise, Mr. MacNamara testified that Debtors' cell phone bill will decrease to approximately $140.00 per month (from $ 286.00 per month) when Debtors cease to subsidize their children's cell phone usage. (N.T. 36)

Debtors have included on Schedule I a student loan obligation of $260.00 per month incurred by Mrs. MacNamara in 1998 and 1999. The UST asserts that this Court has held that the payment of the educational expenses of an adult child is not a reasonable and necessary expense in the § 707(b) context. Although this Court held in *In re Staub*, 256 B.R. 567, 570-71 (Bankr. M.D. Pa. 2000) (Woodside), that the discretionary payment of an adult child's educational expenses is not a reasonable expense, this holding is distinguishable from the case at bar. Unlike the facts in *Staub*, the student loan obligation at issue in the within case is a direct obligation of Mrs. MacNamara and is not contingent or discretionary. The more relevant question in the within case is whether Debtors may deduct payments on an unsecured loan (albeit a non-dischargeable obligation) while seeking to discharge other unsecured debt.

Generally, a debtor may not choose to pay one unsecured creditor in preference to other unsecured creditors. *In re Baker*, 400 B.R. 594, 599 (Bankr. N.D. Ohio 2009); *In re Wray*, 136 B.R. 122, 124 (Bankr. W.D. Pa. 1992). Student loans typically are unsecured loans and are not

---

[13]The policies are: U.S. Financial policy # 79926 and AFBA policy # 1K5516.

12

granted priority under the Bankruptcy Code. Accordingly, as part of the analysis of a debtor's ability to fund a hypothetical chapter 13 plan, and, in the absence of a showing of special circumstances, a court must disregard the inclusion of student loan payments as an expense deducted from Debtors' income.

### 4. Whether Debtors' schedules and statements of current income and expenditures reasonably and accurately reflect their true financial condition

Debtors' initial schedules failed to disclose the existence of several insurance policies that were later disclosed in amended Schedule B. Debtors also failed to disclose in their statement of financial affairs annuity income that Mr. MacNamara had received during the two years prior to the filing of the petition. Finally, Debtors did not provide adequate information in the schedules regarding the dates upon which claims were incurred. Despite these deficiencies, the Court does not find that Debtors' schedules failed to reasonably and accurately reflect their true financial condition.

### 5. Whether the bankruptcy petition was filed in bad faith

At the hearing on this matter, the UST stated that the motion to dismiss was being brought under § 707(b)(3)(B), and no evidence was presented that the case was filed in bad faith.

### 6. Whether Debtors engaged in eve of bankruptcy purchases

For purposes of § 707(b), the "eve" of bankruptcy is not limited to the day before the date on which the petition was filed. For some courts, the "eve" of bankruptcy can extend back as far a six months before the filing of the petition. *See In re Wulf*, 2008 WL 5341028 (Bankr. W.D. Wash) (debtor's purchase of a $355,00.00 condominium within the six months preceding the filing was considered to be an eve of bankruptcy purchase); *In re Colgate*, 370 B.R. 50 (Bankr.

13

E.D. N.Y. 1007) (purchase of computer, furniture and other electronic equipment within six months of petition was eve of bankruptcy purchase.). In this case, Debtors' Schedule F did not include for most entries the specific dates on which purchases were made despite the fact that Schedule F specifically requests that information. Most entries on Schedule F showed only the year 2008 as the "date" on which the claim was incurred.[14] When questioned by the UST as to how much of Debtors' total unsecured debt of $160,074.00 was incurred within a year prior to the filing of the case Mr. MacNamara stated that "I really couldn't hazard a guess. I would say it could have been $40,000.00, it could have been $60,000.00. I really don't know because it [the total amount of unsecured debt] was taken from the time that we purchased the house in 2005." (N.T. 44) Accordingly, the UST has failed to meet its burden to establish that Debtors made eve of bankruptcy purchases.

### 7. Whether Debtors enjoy a stable source of future income

Mr. MacNamara operates his food brokerage business out of his home. Based upon a review of Debtors' tax returns for the past three years, the income generated from the business was stable for this period. No evidence was presented that he expects a reduction in income in the future. In addition to his business income, Mr. MacNamara receives a pension of $1,790.00 per month. Mrs. MacNamara's income has been reduced because of her retirement, but she has a stable source of income through a state pension and Social Security.

---

[14] At trial, Debtors' counsel led Mr. MacNamara to testify that, for credit card claims listed on Schedule F, he specifically instructed Debtors to refer to the last date they used the credit card. While such advice may reduce the effort that debtors must expend to prepare their schedules for filing, it may ultimately inure to their detriment in cases wherein the lack of specific information may indicate a lack of candor on the part of the debtors.

14

8. **Whether Debtors' expenses can be reduced significantly without depriving them of adequate food, clothing, shelter and other necessities**

As indicated above, Debtors' monthly income of $7,526.45 will more than adequately provide for their basic needs when Debtors eliminate unnecessary expenses such as the automobile insurance premiums and cell phone bills for their adult children and the premiums for life insurance policies that this Court finds to be unreasonable. Debtors can significantly reduce their housing expenses without depriving themselves of adequate shelter. Further, Debtors will have satisfied their past due tax obligations within the coming year, thus freeing up the $858.00 budgeted for this purpose to devote to the payment of other creditors.

9. **Whether Debtors are eligible for adjustment of their debts through chapter 13**

Debtors are eligible for relief under chapter 13 pursuant to 11 U.S.C. § 109(e).

**B.    Ability to pay**

Having determined that some of Debtors' expenses are unreasonable and unnecessary and can be reduced or eliminated without depriving Debtors of adequate food, clothing, and shelter, I must determine whether by reducing these expenses they will have the ability pay a meaningful amount to their creditors through a chapter 13 plan.

The Court has determined that Debtors are entitled to continue to maintain two life insurance policies naming Mr. MacNamara as the insured, which provide total insurance coverage of $350,000.00. The total monthly amount of these premiums is $188.65, thus this expense, as listed on Schedule J, can be reduced by $377.35. Auto insurance payments will be reduced to $100.00 per month providing a savings of $98.00 per month for this item. The student

15

loan payment of $260.00 per month is disallowed as a deduction from income and must be paid pro rata with other unsecured debts. Testimony presented at the hearing on this matter also established that Debtors' monthly cell phone bill will be reduced from $286.00 to $140.00 per month – a reduction of $146.00 per month. Finally, after Debtors outstanding taxes are paid, which Mr. MacNamara estimated would be accomplished approximately one year from the date of the hearing, Debtors will have an additional $858.00 a month to devote to a chapter 13 plan. Therefore, even without considering appropriate reductions to their housing costs, by reducing these expenses Debtors will have monthly net income of approximately $370.00 until their delinquent taxes are paid and, thereafter, monthly net income of approximately $1228.00 to satisfy the claims of their unsecured creditors. This would enable them to pay approximately $45,000.00 or 28% of their unsecured debt. If Debtors reduce their housing expenses to $1,350.00 and eliminate the lien payment on the ATV of $170.00, they will be able to generate an additional $1,428.00 per month to pay unsecured debt.

## IV. Conclusion

Accordingly, based upon a consideration of the totality of the circumstances, I find that the filing of this case constitutes an abuse of chapter 7. Therefore, the motion to dismiss will be

16

granted. If a motion to convert to chapter 13 is not filed within ten (10) days, Debtors' case will be dismissed pursuant to the Order accompanying this Opinion.

By the Court,

*Mary D. France*
Bankruptcy Judge

Date: June 5, 2009

*This document is electronically signed and filed on the same date.*